# United States District Court

_____MIDDLE_____ DISTRICT OF _____ALABAMA_____

| | |
|---|---|
| **In the matter of the Search of** (Name, address or brief description of person, property or premises to be searched)<br><br>**Emachine W3107 personal computer Serial #CCA6150001557, including the hard drive** | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**<br><br>CASE NUMBER: 2:07mj43-TFM |

I _____Christopher P. LaCarter_____ being duly sworn depose and say:

I am an agent with _Special Agent, Federal Bureau of Investigation_ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

**Emachine W3107 personal computer, Serial #CCA6150001557, including the hard drive,**

in the _____Middle_____ District of _____Alabama_____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

**Emachine W3107 personal computer, Serial #CCA6150001557, including the hard drive,**

which is (state one or more bases for search set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

**property that constitutes evidence of the commission of a criminal offense,**

concerning a violation of Title ___18___ United States Code, Section(s)_____2252A_____

The facts to support the issuance of a Search Warrant are as follows:

**See Attached Affidavit**

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

_____
Signature of Affiant, Christopher P. LaCarter

Sworn to before me and subscribed in my presence,

April 5, 2007                              at   Montgomery, Alabama
Date                                              City and State

TERRY F. MOORER
United States Magistrate Judge                    _____
Name & Title of Judicial Officer                  Signature of Judicial Officer

# AFFIDAVIT

Your affiant, Christopher P. LaCarter, having first been duly sworn, does state that the following information is true and correct to the best of his knowledge:

I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) assigned to the Montgomery Resident Agency of the Mobile Division of the FBI, and have been so employed for the past eight months. Prior to my employment with the FBI, I was employed by the Hickory Police Department (HPD), Hickory, North Carolina, for 10 years. During the past 10 ½ years of my law enforcement career, I have received training in the investigation of Computer Crimes and have personally participated as an assisting agent during the investigation of Child Pornography cases.

1. This affidavit is being submitted in support of an application for a warrant to search a Emachines W3107 personal computer, serial number CCA6150001557, seized from William Jessie Knighten, 356 County Road 403, Clanton, Alabama 35045, on March 14, 2007.

2. The facts and information contained in this affidavit are based on my personal knowledge and observations, as well as upon information received from other individuals, to include other law enforcement officers involved in this investigation and review of records, documents and other physical items obtained during this investigation. Based upon the investigation described below, I submit that the facts set forth in this affidavit establish that there is probable cause to believe that in the Middle District of Alabama, on March 14, 2007, William Jessie Knighten engaged in possession of Child Pornography; and evidence of such crimes is

located on the hard drive of the computer to be searched.

3. Based on your affiant's training and experience, your affiant knows that it is common for individuals involved in the possession of Child Pornography to maintain files and other digital records used in the course of committing these crimes, on their computer hard drive and other computer storage devices.

4. On January 19, 2007, the Mobile Division of the FBI received information from the San Diego Division that James Randall Thomas, using the America Online (AOL) screen name JRBONITA, had transmitted an image and video of his own genital region to an Undercover Agent (UCA) who he believed was a 13 year old girl. The images were sent via forwarded e-mails on 10/24/2006 in conjunction with a sexually explicit AOL chat between JRBONITA, later identified as James Randall Thomas, and the UCA. Since Thomas failed to remove the header information on the forwarded messages, the screen names of all past recipients of these files were also sent to the UCA.

5. Subsequent conversations with other UCAs revealed that Thomas has been very aggressive in the past when trying to persuade under-age girls to meet for sex. On at least two occasions Thomas placed phone calls to UCAs, the content of which was extremely sexual in nature. During these conversations he discussed making travel arrangements to visit the UCAs and described the sexual acts he desired upon arrival.

6. Based on this information, it was believed that the other screen names listed on the forwarded e-mails may have belonged to underage girls that Thomas has chatted with. These screen names and subscriber information associated with them was sent to all field offices where subscribers reside.

7. One of the screen names that appeared in the forwarded e-mails to the UCAs was for the AOL screen name "Jes2006a", which appeared to have received a nude image of an adult male from AOL screen name JRBONITA on 05/27/2006. San Diego Division provided the following subscriber information associated with AOL screen name "Jes2006a": Diane La Rose, 356 County Road 403, Clanton, Alabama 35045, telephone number 205-280-0202.

8. On March 14, 2007, your affiant, along with SA Tyler McCurdy visited the dwelling of 356 County Road 403, Clanton, Alabama 35045. William Jessie Knighten answered the door and was informed by the affiant as to the nature of the visit. Knighten stated that he may have used the AOL screen name "Jes2006a" in the past when he was impersonating a young female while engaged in on-line chatting.

9. The affiant requested consent from Knighten to search his computer and informed Knighten that consent was completely voluntary. Knighten voluntarily agreed to the search of his computer and signed a Consent To Search Computer form. Knighten admitted that his computer did contain Child Pornography images that he had received from unknown persons while engaged in on-line chatting.

10. A consensual search of Knighten's computer led to the discovery of images depicting child pornography. The images viewed during the consensual search of the computer depicted nude minor females whose ages appeared to range from babies to 16 years of age, to adult females.

11. Knighten gave full consent for a search of his computer and voluntarily allowed the affiant to seize the computer in order to conduct an offsite analysis of the contents of the hard drive. Many of the images viewed included minors engaging in explicit sexual activity.

## COMPUTER RELATED ISSUES

12. The following section of this affidavit is based upon the collective experience gained from previous investigations by the FBI in similar criminal violations, and upon my, and other SAs' of the FBI, personal knowledge and experience.

13. There is reason to believe that computer hardware[1], computer software[2], and computer-related documentation[3] were utilized by the subject of this investigation in two respects: as instrumentalities for violating the federal laws, and as devices used to send, collect and store

---

[1] Computer hardware is described as any and all computer equipment, including any electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include, for example, data-processing hardware, communications equipment, memory typewriters, encryption circuit boards, central processing units, internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, or other memory storage devices), peripheral input/output devices (such as keyboards, printers, plotters, video display monitors, and optical readers), and related communications devices (such as modems, cables and connections, recording equipment, solid state memory units {including random access memory [RAM] and read only memory [ROM]}, acoustic couplers, automated dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices).

[2] Computer software is described as any and all information including any data, instructions or programs stored in the form of electronic, magnetic, or other media which are capable of being interpreted by a computer or its related components. These items include, for example, data, operating system software, applications software, network communications programs, utility programs, compilers, interpreters, communications software, and other programming utilized to communicate with computer components.

[3] Computer-related documentation is described as any written, printed or electronically stored material which explains or illustrates the configuration or use of any seized hardware, software, or related item. These items include, for example, user manuals, etc.

4

electronic data and records that are evidence of those crimes.

**Computer-related Material Used as Instrumentalities.**

14. Based on the evidence summarized earlier in this affidavit, there is reason to believe that William Jessie Knighten:

    (a)    has utilized computer hardware (personal computer, telephone modem, cable modem, storage devices, peripheral devices, and other related hardware) to obtain and posses Child Pornography;

    (b)    has utilized computer software to establish electronic connections to obtain and posses Child Pornography;

    (c)    has utilized computer hardware and software to record account information (site names, account names, passwords, etc.) for web sites and file sharing services used to obtain and posses Child Pornography; and

    (d)    has utilized computer hardware and software to record and save logs (transcripts) of chat room and other on-line communications with individuals attempting to obtain and posses Child Pornography.

**Computer-related Material Used to Collect and Store Evidence.**

15. Based on the evidence summarized earlier in this affidavit, there is reason to believe that William Jessie Knighten used computer(s) to store, maintain, retrieve, transmit and use electronic data[4] in the form of electronic records, documents, and materials, including those used to facilitate

---

[4] This data may be described as any information stored in the form of electronic, magnetic, or other coding on computer media or on media capable of being read by a computer or computer-related equipment. This media include, but are not limited to, fixed hard disks and removable hard disk cartridges,

communications. This includes logs generated by chat programs, instant mail, and electronic messages (E-mail) in Knighten's email account. Specifically, there is reason to believe that Knighten used E-mail account(s) to store, maintain, retrieve, transmit and used the following electronic data types:

    (a) computer software (described above) used for criminal purposes;

    (b) logs (transcripts) of chat room and other on-line communications, including open and unopen E-mail messages;

    (c) account information (site names, Internet addresses, account names, screen names, passwords, telephone numbers, etc.); and

    (d) system accounting and auditing logs, which record the operations occurring on that computer (including criminal activities).

16. The terms "records," "documents," and "materials" as used above include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications which may have been created or stored on the computer hard drive.

17. The terms "records," "documents," and "materials" also include any and all information and/or data, stored in any form, which is used either for periodic or random back-up, whether deliberate or inadvertent, or automatically or manually initiated, of any computer or computer system. This includes floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and other media which are capable of storing magnetic coding.

18. Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate the above described storage and communications, constitutes

evidence of the commission of a criminal offense.

**Requirement to Seize Equipment and Data**

19. In order to completely and accurately retrieve data maintained in computer hardware or computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is usually necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

20. The volume of evidence. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, flash memory) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search "on-site."

21. Technical Requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data search protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted

files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

22. Due to the volume of the data at issue and the technical requirements set forth above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. One factor in determining whether to search a computer on-site or to remove it from the premises is whether the computer constitutes an instrumentality of an offense, as in this case, and is thus subject to immediate seizure as such, or whether it serves as a mere repository for evidence of a criminal offense. Another factor is whether, as a repository for evidence, a particular device can be more readily, quickly, and thus less intrusively searched off-site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent upon the amount of data and number of discrete files or file areas that must be searched, and this is frequently dependent upon the particular type of computer hardware involved.

23. Searches and seizures of evidence from computers taken from the subject premises commonly require agents to seize most or all of a computer system's input/output peripheral devices for a qualified computer expert to accurately reconstruct the system's original configuration and retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the subject premises, and in order to fully retrieve data from a computer system, investigators may seize all magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards, monitors, and peripheral devices which are an

integral part of the processing unit.[5] If, after inspecting the input/output devices, system software, and pertinent computer-related documentation it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, such materials and/or equipment will be returned within a reasonable time.

24. <u>Search of electronic data</u>. The search of electronically stored data, whether performed on-site or in a laboratory of other controlled environment, may entail any or all of several different techniques. Such techniques may include: surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

---

[5] The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence from it. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation. Without these items, it may be difficult and time consuming to recreate the computer environment in which the seized data was created. This is important both for thorough analysis and for establishing the ultimate integrity of the seized data.

## SUMMARY

25. Based on the facts as stated above, there is probable cause to believe that William Jessie Knighten, with intent to engage in possession of Child Pornography, did knowingly use a facility and means of interstate commerce, computerized access to the Internet, to obtain Child Pornography, in violation of Title 18, United States Code, Sections 2252A.

26. Further, there is probable cause to believe that the items and materials as stated above can be found on Knighten's computer currently in FBI custody, which items and materials, constitute instrumentalities, contraband, fruits of crime, and evidence of violation of Title 18 USC Section 2252A.

Christopher P. LaCarter
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this 5th day of April, 2007.

United States Magistrate Judge

FD-597 (Rev 8-11-94)   Page 1 of 1

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # 305B-MO-45517

On (date) 4/6/2007

item(s) listed below were:
- [ ] Received From
- [ ] Returned To
- [ ] Released To
- [x] Seized

(Name) WILLIAM JESSIE KNIGHTEN
(Street Address) 356 County Road 403
(City) Clanton, Alabama 35045

Description of Item(s): Emachines W3107 personal computer serial number CCA6150001557

Nothing further

Received By: SA Christopher P. ZaCarto (Signature)
Received From: (Signature)